**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JACK LEBEAU and SHARON LEBEAU, his wife, | : |
| | : |
| Petitioners, | : |
| | : |
| v. | : Civil Action No. 2:05-cv-05876-JD |
| | : |
| OPPENHEIMER & CO. INC., formerly known | : |
| as FAHNESTOCK & CO. INC. and | : |
| THE ESTATE OF JEFFREY S. VIZAK, | : |
| | : |
| Respondents. | : |
| | : |

## ORDER

AND NOW, this ___ day of _____, 200___, upon consideration of the

Petition of Jack and Sharon Lebeau to Vacate the Arbitration Award, and any response thereto, it is

hereby ORDERED, ADJUDGED, AND DECREED that the Petition to Vacate is DENIED.

IT IS FURTHER ORDERED that, upon consideration of the Cross-Petition to

Confirm the Arbitration Award, and any response thereto, it is hereby ORDERED, ADJUDGED,

AND DECREED that the arbitration award entered on August 31, 2005 titled <u>Jack Lebeau and

Sharon Lebeau v. Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak</u>, National

Association of Securities Dealers, Inc., Case No. 02-04964 ("Arbitration Award") is hereby

CONFIRMED.

_____

J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JACK LEBEAU and SHARON LEBEAU, his wife,      :
      :
          Petitioners,      :
      :
          v.      :  Civil Action No. 2:05-cv-05876-JD
      :
OPPENHEIMER & CO. INC., formerly known      :
as FAHNESTOCK & CO. INC. and      :
THE ESTATE OF JEFFREY S. VIZAK,      :
      :
          Respondents.      :
      :

**RESPONSE TO PETITION TO VACATE**
**AND CROSS-PETITION TO CONFIRM ARBITRATION AWARD**

      Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak hereby respond to the

Petition to Vacate the award entered in the matter of Jack Lebeau and Sharon Lebeau v.

Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak, National Association of Securities

Dealers, Inc., Case No. 02-04964 ("Arbitration Award").

      Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak also cross-petition for

confirmation of the Arbitration Award pursuant to 9 U.S.C. § 9.

      Incorporated by reference herein is the attached Memorandum of Law In

Opposition to Petition to Vacate and In Support of Cross-Petition to Confirm the Arbitration

Award.

**RESPONSE TO PETITION TO VACATE**

      1.-5.   Denied.

      6.     Admitted.

      7.     Admitted.

WHEREFORE, Respondents Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak hereby request that the Court deny the Petition to Vacate of Petitioners Jack and Sharon Lebeau.

### CROSS-PETITION FOR CONFIRMATION OF ARBITRATION AWARD

1.      On or about August 19, 2002, Jack Lebeau and Sharon Lebeau filed a Statement of Claim before the National Association of Securities Dealers, Inc. ("NASD"), alleging certain claims relating to the handling of their brokerage account at Oppenheimer & Co. Inc.  The Lebeaus named as respondents Oppenheimer & Co. Inc. and Jeffrey S. Vizak, the financial analyst assigned to the Lebeaus' account.  Mr. Vizak is now deceased.

2.      The claim was filed with the NASD pursuant to the terms of the Lebeaus' account agreement with Oppenheimer & Co. Inc., which requires that all controversies between the parties be submitted to arbitration.

3.      On or about January 3, 2003, Oppenheimer & Co. Inc. and Jeffrey S. Vizak filed their Answer to the Statement of Claim.

4.      The arbitration in the above matter was held in Philadelphia, Pennsylvania on September 20, 2004; March 8, 9, and 10, 2005; and August 22 and 23, 2005.

5.      The arbitration panel entered an award in this matter on August 31, 2005. The panel denied the Lebeaus' claims in their entirety.

6.      Pursuant to 9 U.S.C. § 9, the Arbitration Award should be confirmed absent an order granting vacatur, modification, or correction of the award.

7.      As set forth more fully in the attached Memorandum of Law, the Petition to Vacate of Jack and Sharon Lebeau should be denied.

8.      The Arbitration Award should therefore be confirmed pursuant to 9 U.S.C. § 9.

2

WHEREFORE, Cross-Petitioners Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak hereby request that the Court enter an Order in the form proposed confirming the award of August 31, 2005 and entering judgment in conformity with the award.

WM743 / ANH5734
William E. Mahoney, Jr., Esq.
A. Nicole Stover, Esq.
Stradley, Ronon, Stevens & Young, LLP
One Commerce Square
Philadelphia, PA  19103
(215) 564-8000

Attorneys for Respondents,
Oppenheimer & Co. Inc. and
the Estate of Jeffrey S. Vizak

Date:   January 4, 2006

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

JACK LEBEAU and SHARON LEBEAU, his wife,     :
                                             :
                Petitioners,                 :
                                             :
            v.                               :   Civil Action No. 2:05-cv-05876-JD
                                             :
OPPENHEIMER & CO. INC., formerly known       :
as FAHNESTOCK & CO. INC. and                 :
THE ESTATE OF JEFFREY S. VIZAK,              :
                                             :
                Respondents.                 :
_____      :

**MEMORANDUM OF LAW IN OPPOSITION TO PETITION TO VACATE**
**AND IN SUPPORT OF CROSS-PETITION TO CONFIRM ARBITRATION AWARD**

Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak ("Respondents")

hereby submit this Memorandum of Law in opposition to Jack and Sharon Lebeaus'

("Petitioners" or the "Lebeaus") Petition to Vacate the award entered in the matter of Jack

Lebeau and Sharon Lebeau v. Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak,

National Association of Securities Dealers, Inc., Case No. 02-04964 ("Arbitration Award") and

in support of Respondents' Cross-Petition to confirm the Arbitration Award.

## I.    INTRODUCTION

In 1997, Petitioners, Dr. Jack and Sharon Lebeau opened an investment account at

Fahnestock, with Jeffrey Vizak ("Vizak") as their Financial Consultant.  Over the next five

years, the Lebeaus pursued an investment strategy focused on growth.  During that time, the

Lebeaus saw the value of their investments fluctuate in value, sometimes significantly in a short

period of time.  Despite these fluctuations, and despite the knowledge that their chosen

investment strategy could result in their losing money, the Lebeaus chose to stay the course.

One of the reasons the Lebeaus continued to pursue a growth strategy was to

finance their lifestyle.  The Lebeaus withdrew from their Fahnestock account large amounts of money on an almost monthly basis.  Between January 1999 and July 2002 (when they transferred their accounts away from Fahnestock), the Lebeaus withdrew roughly $1,400,000 – or over $33,000 per month on average – from their account and spent it.  The Lebeaus never reduced their spending, even when their accounts began decreasing in value in 2000 and beyond.  Indeed, even after the Lebeaus left Fahnestock in 2002, they continued to withdraw money from their investment accounts.  By 2004, the Lebeaus had spent all of their money.

The Lebeaus commenced an arbitration against Respondents in 2002 under the auspices of the National Association of Securities Dealers Inc. ("NASD").  The matter was heard before a panel of neutral arbitrators over five (5) days between March and and August 2005.  The Lebeaus, through their counsel, confirmed their acceptance of the arbitrators at the beginning of the proceedings.  At the conclusion of the arbitration proceedings, the Lebeaus, again through counsel, confirmed that they had received a full and fair opportunity to present their case.  Shortly after the final hearing date on August 23, 2005, the Panel issued an award denying the Lebeaus' claims in their entirety.

Now, the Lebeaus seek to have this Court vacate that Award, arguing that the very Panel that they accepted before, during, and after the arbitration was guilty of misconduct, bias, and incompetence.  The Lebeaus contend that the Panel denied them a fair arbitration by, among other things, depriving them an opportunity to obtain documents from Respondents in discovery, failing to make adequate disclosures in advance of the hearing, and (to put it charitably) simply being too old and feeble.  For good measure, the Lebeaus also allege that the Panel's award was irrational and in manifest disregard of the law.

None of the allegations have even a glimmer of merit.  The Lebeaus received all relevant documentation in discovery, and had every opportunity to present that evidence at the

hearing.  That the Lebeaus may disagree with some of the Panel's evidentiary rulings or discovery decisions is of no moment.  An arbitration award cannot be disturbed merely because the Panel may have made the wrong evidentiary decision.  All that is required is that the Panel provide the parties with a fundamentally fair hearing.  That is precisely what the Petitioners' received in this case.

The Lebeaus' claims that the Panel members were biased or inattentive (or short with Petitioners' counsel) are neither supported by the record nor a sufficient basis for vacating the award.   As noted above, the Petitioners affirmatively accepted the Panel before the hearing began, and they affirmatively stated that the Panel had provided them with a full and fair opportunity to be heard when the hearing concluded.  Petitioners confirmed their acceptance of the Panel with full knowledge of the various instances of alleged "misconduct" upon which they base their Petition to Vacate.  Having failed to raise or challenge that perceived misconduct before, during or by the conclusion of the hearing, the Petitioners are in no position to do so now.

Finally, there is no support for Petitioners' argument that the Panel either disregarded the law or acted irrationally in rendering its award.  The record of the arbitration hearings is replete with evidence sufficient to justify and support the Panel's award.[1]  Moreover, the record also confirms that the Petitioners simply failed to meet their burden of proof.  Among other things, the Petitioners failed to present any evidence (in the form of expert testimony or otherwise) that the Lebeaus' investments at Fahnestock were unsuitable for them, and through their counsel they attempted to declare their central witness – Dr. Lebeau himself – incompetent

---

[1]        The record is cited throughout this Memorandum and relevant portions of transcripts from each hearing day are attached as follows: Tr. of 9/20/04, attached as Exhibit "A"; Tr. of 3/8/05, attached as Exhibit "B"; Tr. of 3/9/05, attached as Exhibit "C"; Tr. of 3/10/05, attached as Exhibit "D"; Tr. of 8/22/05, attached as Exhibit "E"; Tr. of 8/23/05, attached as Exhibit "F".

to testify.  This, after Dr. Lebeau had already testified on direct and on cross examination for the better part of three days.

In short, the Panel afforded the Petitioners ample opportunity to present their evidence and argue their case, and the Panel rendered an award supported by the record.  That is all that is required.  The Petitioners are simply not entitled to have the award vacated.

## II.   <u>STANDARD OF REVIEW</u>

The Federal Arbitration Act ("FAA") allows a district court to vacate an arbitration award only in the following discrete circumstances:

> (1)   Where the award was procured by corruption, fraud, or undue means;
>
> (2)   Where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3)   Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)   Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In addition, an arbitration award can be vacated if it is in "manifest disregard of the law."  <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 942 (1995).

It is well established that the scope of review under the FAA is "narrow in the extreme."  <u>Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers Meat Packers, Inc.</u>, 518 F.2d 1113, 1121 (3d Cir. 1975).  "Whenever possible, arbitration awards should be construed to uphold their validity because a contrary course would result in the substitution of the judgment of the court for the judgment of the arbitrators chosen by the parties and that would make the award itself the beginning, not the end, of litigation."  <u>Yardis Corp. v. Silver</u>, 2005 WL

4

2405970, at *4, No. 88-CV-07211 (E.D. Pa. Sept. 28, 2005).  Thus, the Court's function in

confirming or vacating an arbitration award is severely limited, and "the terms of an arbitral

award will not be subject to judicial revision unless they are completely irrational."  <u>Mutual Fire,</u>

<u>Marine & Inland v. Norad Reinsurance</u>, 868 F. 2d 52, 56 (3d Cir. 1989).  Put differently, the only

question before the Court is "whether the arbitrators' award can in any way be deemed rational.

<u>Elliott v. Kidder, Peabody & Co.</u>, 1992 WL 172655, at *2, No. 92-837 (E.D. Pa. Jul. 8, 1992).

Generally speaking, the FAA limits the Court's role to determine whether the parties received a

fair and honest hearing on a matter within the arbitrator's authority.  <u>National Clearing Corp. v.</u>

<u>Treff</u>, 2005 WL 67075, at *2, No. 04-CV-4765 (E.D Pa. Jan. 10, 2005).

   As demonstrated below – and as confirmed by their counsel at the conclusion of

the arbitration – Petitioners received "more than a fair opportunity to be heard."  (<u>See</u> 8/23/05 Tr.

at 207.)

## III. <u>ARGUMENT</u>

###   A. <u>The Panel's Discovery Rulings Are Insufficient Grounds for Vacatur.</u>

   The principal argument advanced by Petitioners is that the Panel engaged in

misconduct by failing to order Respondents to produce certain documents in discovery.  (<u>See</u>

Petitioners' Mem. at 6-8, 18-25.)  According to Petitioners, (i) the Respondents failed to produce

various categories of documents that Petitioners requested in discovery, (ii) the Panel failed to

compel Respondents to produce such documents, and (iii) as a result, the Panel deprived

Petitioners of the opportunity to present these documents in support of their claims.  Put

differently, Petitioners contend that the Panel deprived them of "due process and their

opportunity to be fully heard."  (<u>Id.</u> at 24.)

   Adverse rulings on discovery motions are insufficient grounds for vacatur.  <u>See</u>

<u>Carmel v. Circuit City Stores, Inc.</u>, 2000 WL 1201891, at *3-4, No. 99-MC-240 (E.D. Pa. Aug.

5

22, 2000) (denial of discovery motions was insufficient for vacatur and did not evidence partiality). "Courts must not decide the rightness or wrongness of the arbitrators' contract interpretation, only whether the panel's decision 'draws its essence' from the contract. In making that determination, the district court must accord considerable deference to the arbitrator's judgment and should not vacate the award because it interpreted the agreement differently." Recyclers Ins. Group, Ltd. v. Insurance Co. of North America, 1992 WL 150662, at *3, No. 91-503 (E.D.Pa. June 15, 1992) (citing Swift Industries, Inc. v. Botany Industries, Inc., 466 F.2d 1125, 1131 (3d Cir. 1972)). This is particularly true in the context of discretionary rulings on matters of evidence. Vacatur for failure to allow pertinent evidence can only occur in extreme circumstances where the rights of a party are significantly impaired: "Only the most egregious error which adversely affects the rights of a party constitutes 'misconduct in refusing to hear evidence pertinent and material to the controversy.'" Grosso v. Salomon Smith Barney, 2003 WL 22657305, at *6, No. 03-MC-115 (E.D. Pa. Oct. 24, 2003).

Here, the Panel exercised its judgment and ruled on various discovery motions. Decisions on evidentiary matters fall within the broad discretion of the arbitrator and "a court cannot act as a legal screen to comb the record for technical errors in the receipt or rejection of evidence by arbitrators, who in most cases are laymen." See Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968), cert. denied, 393 U.S. 954 (1968). This Court should defer to those rulings, particularly where, as here, the Petitioners fail even to suggest how those rulings adversely impacted the presentation of their case or the fundamental fairness of the proceedings.

However, even if the Court were permitted to consider the Panel's decisions regarding discovery, it is clear that (i) Petitioners received all relevant documents and information sufficient to present their claims, (ii) the Panel properly considered and ruled upon

6

Petitioners' various motions to compel the production of documents, and (iii) Petitioners were not prejudiced in any way by the Panel's discovery rulings.

> **1.      Respondents produced all relevant documents and complied with the Panel's discovery orders.**

As a preliminary matter, Petitioners were not denied pertinent documents. Contrary to Petitioners' suggestion that they received virtually no documents in discovery, Respondents produced over 2,000 pages of documents responsive to Petitioners' discovery requests. (See generally 9/20/04 Tr. at 37-49.)  Indeed, Respondents agreed to – and did – produce documents in response to the vast majority of Petitioners' document requests.  (See Resps.' Answer to Clmts.' First Request for Documents and Information, attached hereto as Exhibit "G".)

In their Petition, Petitioners contend that they were "denied" various categories of documents and information, and cite sixteen of their documents requests to which, they contend, no responsive documents were provided.  (See Petitioners' Mem. at 20.)   Interestingly, Petitioners argued in their various pre-hearing motions that Respondents failed to produce documents in response to the very same requests.  And as Respondents pointed out before the Panel then, Respondents did provide responsive documents to many of these requests.

In response to Petitioners' document request nos. 13, 14, 17, 18, and 19, Respondents responded as follows:  "Objection.  Respondents object to this request on the grounds that it seeks information that is irrelevant to any matter at issue between the Claimant and Respondents in this arbitration.  **Without waiving these objections, Respondents will provide to Claimants all non-privileged, responsive documents**."  (See Resps.' Answer to Clmts.' First Request for Documents and Information) (emphasis added.)

With regard to Petitioners' document request nos. 14, 15, and 16 – each of which seeks commission and compensation information – Respondents provided to Petitioners confirmation statements for every transaction in Petitioners' accounts, which confirmations contained commission information for each transaction.  It is curious that Petitioners would suggest to the Court that they were deprived of commission information when they introduced into evidence at the hearing a profit and loss analysis, which contains the very commission information Petitioners now contend they did not have.  (See Profit & Loss Analysis, attached as Ex. 20 to Petitioners' Mem.)   What makes it more curious still is the fact that Petitioners' counsel confirmed at the hearing that "[w]e have Mr. Vizak's commission statements."  (See 3/8/05 Tr. at 299-300.)  Plainly, the Petitioners received commission information and were able to utilize it at the hearing.

In their document request No. 20, Petitioners sought copies of research reports and related materials prepared or used by Respondents "relating to the transactions or products at issue . . ."  In response, Respondents stated as follows:

> Objection.  Respondent objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks information irrelevant to any matter at issue in this arbitration.  Respondent further object to this request because Claimants have not yet identified the relevant "time period" and "transactions or products at issue" in this matter.  Subject to and without waiving this objection **Respondent will produce all responsive, non-privileged documents for the transactions at issue in this case, once Claimants first identify the relevant "time period" and the "transactions or products at issue" in this matter.**

(See Resps.' Answer to Clmts.' First Request for Documents and Information) (emphasis added.) Thus, Respondents agreed to produce responsive documents, once Petitioners identified the transactions at issue.  Petitioners never did so.  (See 9/20/04 Tr. at 44-46.)  Respondents can

hardly be faulted for not producing responsive documents when Petitioners themselves declined to identify the documents they were seeking.

       Petitioners also contend that that they were denied documents responsive to a number of requests that sought information relating to other customers of and complaints against Respondent Vizak.  Respondents did object to these requests and did not agree to produce any responsive documents, on the grounds that the requests were "overly broad, unduly burdensome, and irrelevant to any matter at issue in this arbitration."  (See Resps.' Answer to Clmts.' First Request for Documents and Information at nos. 22, 26, 27, 32, and 33.)   Notwithstanding this objection, as Respondents pointed out several times to both Petitioners and the Panel, Respondents had previously provided to Petitioners' counsel in a prior arbitration documents relating to every other customer complaint against Respondent Vizak.  (See 9/20/04 Tr. at 63-64.)

       It also bears noting that Petitioners were <u>not</u> deprived of the opportunity of using any of this information at the arbitration.  Their counsel introduced documents relating to other customer complaints at the hearing and cross examined Alan Lang, Mr. Vizak's Branch Office Manager, extensively on these other complaints.  (See, e.g., 3/8/05 Tr. at 259-282.)

       Finally**,** Petitioners contend that they were not provided documents "supporting Respondents' calculation of damages" (Request No. 35) and documents relating to Mr. Vizak's attendance at Fahnestock and his medical records.  (Request Nos. 39 and 40.)  However, as Respondents' counsel informed both opposing counsel and the Panel, Respondents did not prepare a calculation of damages, did not maintain attendance records or other documents that would indicate Mr. Vizak's attendance, and did not possess any of Mr. Vizak's medical records. (See  9/20/04 Tr. at 43; <u>see also</u> 3/4/04 Response to Claimant's Motion for Clarification, attached hereto as Exhibit "H".)

Simply put, Petitioners received in discovery and had available for use at arbitration all of the information that they now contend was denied them.  However, to the extent Petitioners believed they were entitled to additional documentation, they were perfectly capable of raising the issue with the Panel.  And as the following demonstrates, when Petitioners did raise discovery issues, the Panel ruled appropriately.

>    **2.      The Panel did not engage in misconduct in ruling on discovery issues.**

There is no basis whatsoever to suggest that the Panel engaged in any misconduct in connection with the discovery process or its discovery rulings.  In October 2003, Petitioners filed a Motion to Compel, which motion was denied in its entirety by Chairman Cahan pursuant to an Order dated December 5, 2003.

Following a request by Mr. Guiliano to have oral argument on the Motion to Compel, Chairman Cahan presided over a telephone conference on December 12, 2003, in which Mr. Guiliano argued that certain of Petitioners' requests should have been granted.  During that call, Petitioners' counsel had every opportunity to present argument in connection with any discovery request he saw fit.  However, counsel chose to limit his argument to just *four requests*.

After hearing argument on those requests, Chairman Cahan issued a second Order, dated December 15, 2003.  In that Order, he found in favor of Petitioners on Request Nos. 32, 39, and 40 and in favor of the Respondents on Request No. 22.  (See Discovery Order, attached hereto as Exhibit "I".)  Petitioners filed a Motion for Reconsideration of this second Order.  The Panel denied that motion in its entirety on January 3, 2004.[2]

_____

[2]      Respondents complied with the Order by letter dated March 4, 2004, in which Respondents explained that they had previously complied with Request no. 32, and that they had no additional documents responsive to Request nos. 39 and 40.

Apparently not satisfied with the Chairman's denial of Petitioners' Motion for Reconsideration, Mr. Guiliano filed yet another motion – this one styled "Claimants' Motion for Clarification" – on February 17, 2004.  Respondents filed their response to this motion on March 4, 2004.  (See 3/4/04 Response, attached hereto as Exhibit "J".)  In their response, Respondents pointed out that they had already produced to Petitioners' counsel all documents in their possession in response to Request No. 32.  Specifically, Respondents informed the Panel that it had produced to opposing counsel Mr. Vizak's entire registration and employment files, his Form U-4 (which identifies customer complaints against Mr. Vizak), and other documents in its possession relating to other customer complaints against Mr. Vizak.  Respondents also noted that they had fully complied with Request Nos. 39 and 40.  The Panel issued an Order on March 15, 2004 denying Petitioners' Motion for Clarification.  (See Order, attached hereto as Exhibit "K".)

Notably, Petitioners did not again raise any issues regarding discovery until shortly before the arbitration hearing was scheduled to begin in September 2004.  On September 7, 2004, Petitioners filed a Motion for Sanctions, again alleging that Respondents had not produced certain documents during discovery.  (See Claimants' Motion for Sanctions, attached hereto as Exhibit "L".)  In this Motion, Petitioners contended that Respondents failed to produce documents in response to five requests.[3]  (See id. at 6, 8.)  Respondents filed their response to this motion (together with a cross motion for sanctions against Claimants for filing a frivolous motion filled with untrue allegations) on September 13, 2004.  (A copy of Respondents' Response and Cross Motion is attached hereto as Exhibit "M".)  As set forth in their Cross

---

[3]      It is worth noting that although the Lebeaus reference 16 document requests in their Petition to Vacate, they chose to raise only five requests before the Panel in their Motion for Sanctions.  One would think that if the Lebeaus believed they were unfairly or improperly denied discovery on all 16 requests, they would have raised all of them before the Panel.  They did not, and as a result must be deemed to have waived any objections in connection with those additional requests.

11

Motion, Respondents either produced documents responsive to these requests or confirmed that they had no responsive documents in their possession.[4]  (Id. at 3-5.)

Petitioners had every opportunity to argue their Motion before the Panel on September 20, 2004, the first scheduled day of the arbitration hearings.  Indeed, the Panel heard argument on Petitioners' Motion and, in particular, Petitioners' contention that it had been denied relevant documentation.  (See 9/20/04 Tr. at 29-71.)  Following argument and deliberations, the Panel determined Petitioners were not entitled to any additional discovery at that time.  (Id. at 70-71.)   Subsequently, Petitioners proceeded to present their case over five (5) days of hearings.  At no point did Petitioners contend that they were prejudiced or impaired by a lack documentation.

There can be no doubt Petitioners had more than a fair opportunity to argue that they were entitled to additional documents.  Based upon the arguments made on behalf of the parties, the Panel decided that Petitioners were not entitled to any additional documents.  Having had a full and fair opportunity to argue before the Panel, Petitioners are not entitled to have the arbitration award disturbed merely because they contend, yet again, that the Panel should have decided differently on discovery issues.  There is simply no basis upon which this Court should vacate the arbitration award.

### 3.   Petitioners suffered no prejudice from the discovery rulings.

Finally, Petitioners fail entirely to suggest how they were prejudiced or denied a fundamentally fair hearing by the Panel's discovery rulings.  Rather, Petitioners are content to

---

[4]      Respondents' answer to the Motion for Sanctions details some of the reasons why Petitioners' discovery motions were properly denied.  For example, Petitioners—even in their Petition to Vacate—claim that they did not receive responses to request numbers 17 and 20.  Respondents repeatedly informed Petitioners that all documents responsive to request number 17 were contained in their document production.  For request number 20, Respondents informed Petitioners that they would provide responsive documents once Petitioners identified the time period and

rely upon broad statements to the effect that they "were denied meaningful discovery of certain highly important and highly material aspects of their claim, and accordingly were denied the opportunity to present this evidence to the Panel." (Petitioners' Mem. at 22.)  Nowhere in their Petition or supporting memorandum do Petitioners demonstrate how their presentation of their case was in any way prejudiced by a lack of documentation.

The only documents that Petitioners mention in support of their argument are "exception reports, commission runs, internal audits, special supervisory procedures, and documents relating to Respondent's supervision of Vizak . . . " (Petitioners' Mem. at 23.)  There is no basis even for this contention.  Respondents confirmed that they were not in possession of any exception reports, internal audits, or special supervisory procedures relating to Mr. Vizak.[5] (See 3/8/05 Tr. at 210, 221.)

With regard to commission information, as noted above Petitioners received all trade confirmations, from which the commission information could be derived.  In fact, Petitioners' introduced the confirmations into evidence.  (See 3/8/05 Tr. at 241-42.)  Petitioners also introduced into evidence a "profit and loss" analysis (the "P&L Analysis") that contained, among other information, the commission information.  (See the P&L Analysis, attached at Exhibit 20 to Petition to Vacate; see generally 3/9/05 Tr. at 406-435.)   And notwithstanding Petitioners' contention they were deprived of Mr. Vizak's commission information, Petitioners' counsel confirmed during the arbitration that he, in fact, had that information, and he introduced

---

transactions requested, a reasonable limitation contained in the NASD's own Notice to Members 99-90.  Petitioners never provided the information that Respondents needed in order to comply with Petitioners' request.

[5]     In yet another curious misstatement, Petitioners contend that Mr. Lang acknowledged the existence of "special supervisory procedures relating to Mr. Vizak." (See Petitioners' Mem. at 23.)  However, the very hearing transcript to which Petitioners cite in support of this contention demonstrates exactly the opposite:  Mr. Lang testified that the supervisory procedures "were given to me in verbal instructions from our compliance department to monitor" Mr. Vizak.  (See 3/9/05 Tr. at 89:12-22.)  Nowhere did Mr. Lang suggest that any supervisory procedures relating to Mr. Vizak were in writing.

evidence at the hearing regarding the amount of commissions Mr. Vizak generated during the relevant time period.  (See 3/8/05 Tr. at 300-01, 304-05.) Thus, the Petitioners had available to them all commission information.

Petitioners wholly fail to meet their substantial burden of demonstrating prejudice resulting from the Panel's discovery orders.  Petitioners had an opportunity to brief and argue their discovery motions before the Panel.  Permitting Petitioners to re-argue their claims here would wholly usurp the function of the Panel and the purpose of arbitration.  Yardis Corp. v. Silver, 2005 WL 2405970, at *4, No. 88-CV-07211 (E.D. Pa. Sept. 28, 2005) ("Whenever possible, arbitration awards should be construed to uphold their validity because a contrary course would result in the substitution of the judgment of the court for the judgment of the arbitrators chosen by the parties and that would make the award itself the beginning, not the end, of litigation.").

Far from depriving Petitioners of a fundamentally fair hearing, the Panel afforded Petitioners every opportunity to present relevant evidence in support of their claims.  Indeed, Petitioners' counsel called as their first witness Alan Lang, the Branch Office Manager of the Jenkintown, PA office in which Mr. Vizak worked.  Petitioners questioned Mr. Lang as on cross for an entire day, and presented evidence of, among other things, (i) other complaints against Mr. Vizak, (ii) Mr. Vizak's arrests and admissions into rehabilitation facilities, (iii) Fahnestock's supervision of Mr. Vizak, and (iv) Mr. Vizak's production as a registered representative of Fahnestock.  The Panel also admitted into evidence *every document* that Petitioners sought to introduce, with the singular exception of Mr. Vizak's autopsy report.

It can hardly be argued that Petitioners were denied a fair hearing.  Indeed, Petitioners, through their counsel, confirmed that they did receive a fair hearing.  At the conclusion of the arbitration, the Chair of the Panel asked:  "Will each of the parties state

14

affirmatively whether you had a full and fair opportunity to be heard?"  Petitioners' counsel

replied that "we feel this panel gave us more than a fair opportunity to be heard."  (See 8/23/05

Tr. at 207.)  Having conceded the fairness of the proceeding, it is untenable for Petitioners, after

receiving an adverse award, to now contend that the hearing was so fundamentally unfair that the

award should be vacated.

> **B.     Petitioners Waived All Claims of Arbitrator Partiality, Incompetence,**
> **and Misconduct By Failing to Object Prior to the Rendering of the Award.**
> **Even If Not Waived, Their Allegations Are Unfounded and Do Not**
> **Demonstrate Partiality or Prejudice to Petitioners.**

Petitioners next allege that the Award should be vacated because each of the three

panelists engaged in some form of misconduct or evidenced some form of bias in favor of

Respondents.  None of these allegations has merit.  More to the point, Petitioners have waived

any objection to the composition of the Panel.

Petitioners may not await an adverse award before asserting objections on

grounds on which they had knowledge prior to the award.  Dean Witter Reynolds Inc. v. Bork,

1991 WL 164465, at *3, No. 91-0392 (E.D. Pa. Aug. 21, 2001) (citing Graphic Arts Intern.

Union, Local 97-B v. Haddon Craftsmen, Inc., 489 F. Supp. 1088, 1093 (M.D. Pa. 1979)); see

Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers Meat Packers, Inc., 518 F.2d

1113, 1121 (3d Cir. 1975).  Silence at the arbitration constitutes waiver of that objection if the

grounds were known during the arbitration.  Graphic Arts, 489 F. Supp. at 1093 (holding that

arbitrator's failure to disclose professional relationship could not form basis of bias claim

because no objection was made before award was rendered).  "This rule of law ensures the

finality and economic benefits of arbitration by preventing parties from making post-arbitration

supplements to the record which prolong the dispute resolution process." Dean Witter Reynolds

Inc., 1991 WL at *3 (denying petition to vacate based on waiver of objection to application of

another state's law); see Amalgamated Meat Cutters, 518 F.2d at 1121 ("A party who voiced an ambiguous objection to the arbitrator's jurisdiction at the beginning of arbitration should not be permitted to reopen the arbitrator's award in the courts.")

Petitioners, through their counsel, were actively engaged in the arbitrator selection process.  The parties received information on each of the arbitrators (in the form of an arbitrator profile and arbitrator disclosure forms) well in advance of the hearing.  Upon receiving each arbitrator's information, Petitioners had the opportunity to object to any of the arbitrators and seek to have them removed for cause.  Petitioners never challenged any of the arbitrators who served on the Panel.

Petitioners also affirmatively accepted the composition of the Panel, both on the first day of the arbitration hearing in September 2004 and again when the parties and the Panel reconvened in March 2005. (See 9/20/04 Tr. at 3-4; 3/8/05 Tr. at 4.)  And as noted above, Petitioners confirmed at the conclusion of the hearing that they had received a full and fair opportunity to present their case.  (8/23/05 Tr. at 207.)  It is unconscionable that Petitioners would now suggest that any of the Panel members engaged in misconduct or otherwise failed to discharge their duties, much less suggesting that *each* of them had done so.  Petitioners never claimed that any of the arbitrators exhibited partiality, incompetence, or misconduct prior to the Panel's denial of their claim.  Petitioners' new allegations cannot now form the basis for vacation of the award.

### 1.    Petitioners knew of —and did not object to—Arbitrator Kobak's alleged "potential conflict."

In their Petition to Vacate, Petitioners claim (for the first time) that Arbitrator Kobak engaged in "arbitrator misconduct" by failing to disclose that his employer, Smith Barney, had engaged the law firm of Stradley, Ronon, Stevens & Young, LLP ("Stradley

16

Ronon") to represent it in various arbitrations.  Petitioners contend that Arbitrator Kobak's alleged failure to disclose this relationship somehow constitutes the appearance of bias sufficient to vacate the arbitration award.  Petitioners' argument is misguided.

Well before the arbitration, Petitioners were fully aware of both (i) Arbitrator Kobak's affiliation with Smith Barney, and (ii) Smith Barney's retention of Stradley Ronon in various arbitration matters.  When Arbitrator Kobak was appointed to the Panel, Petitioners received his arbitrator profile, which identified his employment relationship with Smith Barney. (See Arbitrator Profile transmitted on June 24, 2004, attached as Exhibit "N".)  They also received Arbitrator Kobak's disclosure checklist, in which he answered "no" to the question of whether he had a personal or professional relationship with either counsel or counsels' law firms. (See Arbitrator Kobak's Oath of Arbitrator and Arbitrator Disclosure Form, together with NASD cover letter, attached hereto as Exhibit "O".)[6]  Thus, there is no doubt that Petitioners and their counsel were fully aware that Arbitrator Kobak was a Smith Barney branch office manager and that he did not disclose any personal or professional relationship with Respondents' counsel.

Petitioners also knew prior to the arbitration that Stradley Ronon represented Smith Barney and its brokers in various matters.  In their Petition to Vacate, Petitioners cite several actions in which Smith Barney was represented by Stradley Ronon.  (See Petitioners' Mem. at 10, n.10)  Petitioners' counsel was fully aware that Stradley Ronon represented Smith

---

[6]      It bears noting that the Arbitrator Disclosure Form for Arbitrator Kobak, attached as Exhibit 11 to Petitioners' Petition to Vacate Memorandum, is not the Disclosure Form Arbitrator Kobak submitted in connection with the underlying arbitration.  While the two Disclosure Forms do not differ in any material respect, one is compelled to ask (i) how the Lebeaus (or their counsel) came into possession of a form submitted by Arbitrator Kobak in another arbitration and (ii) why they misrepresented that it was submitted in connection with the Lebeaus' arbitration.

Barney in at least some of these matters because he actually represented the claimants in those same matters.[7]

        As opposing counsel in those actions – each of which arose before Arbitrator Kobak was appointed to the Panel in this arbitration and before he submitted his arbitrator profile or disclosure checklist – Petitioners' counsel was fully aware that Stradley Ronon had represented Smith Barney in the past.  Despite this knowledge, Petitioners did not object to Arbitrator Kobak's appointment to the Panel in this case.  To the contrary, Petitioners affirmed their acceptance of Arbitrator Kobak on the Panel at the beginning of the arbitration and on the second day of the arbitration.  Having accepted Arbitrator Kobak, with full knowledge of his affiliation with Smith Barney and of Smith Barney's relationship with Stradley Ronon, Petitioners' are barred now from objecting to Arbitrator Kobak's service on the Panel.

        Even if Petitioners had objected, a professional relationship evidencing partiality does not arise merely because Smith Barney hired local counsel from Stradley Ronon.  There is no evidence that Stradley Ronon ever represented Arbitrator Kobak or had any professional relationship with him.  In fact, Arbitrator Kobak presumably was unaware that Stradley Ronon had ever represented Smith Barney.  Moreover, there is nothing in the arbitrator disclosure form that would require Arbitrator Kobak to disclose that Smith Barney had a relationship with Stradley Ronon.  The relevant question reads as follows:  "Have you had any professional or social relationship with counsel for any party in this proceeding or the firm for which they work?"  (See Kobak's Arb. Disclosure Checklist, at question no. 4.)  The arbitrator disclosure

---

[7]    Avellino, et al. v. Salomon Smith Barney, Inc., et al., NASD Case No. 02-01535 (Statement of Claim filed by Nicholas Guiliano on 3/12/02; Statement of Answer filed by counsel from Stradley Ronon on 10/15/03); Alibert v. Citigroup Global Markets f/k/a Salomon Smith Barney, et al., NASD Case No. 03-6749 (Statement of claim filed by Nicholas Guiliano on 8/31/03; Statement of Answer filed by counsel from Stradley Ronon on 2/8/04); Anthony v. Salomon Smith Barney, Inc., NASD Case No. 01-06062 (Statement of Claim filed by Nicholas Guiliano on 11/5/01; Statement of Answer filed by Stradley Ronon counsel on 2/1/02).

form only asks if the arbitrator himself had a relationship with counsel, not whether his employer had such a relationship.  Petitioners have presented no evidence whatsoever that Arbitrator Kobak had any relationship with Stradley Ronon.  Thus, his disclosures were truthful, and can form no basis for disturbing the award.

Petitioners not only accepted the composition of the Panel and failed to object to Arbitrator Kobak's appointment during the arbitration, but they affirmatively stated that they had a "more than fair" hearing.  Petitioners cannot now claim arbitrator bias when they failed to object to Arbitrator Kobak's disclosure form prior to the rendering of the award.  Dean Witter Reynolds Inc. v. Bork, 1991 WL 164465, at *3, No. 91-0392 (E.D. Pa. Aug. 21, 2001) (citing Graphic Arts Intern. Union, Local 97-B v. Haddon Craftsmen, Inc., 489 F. Supp. 1088, 1093 (M.D. Pa. 1979)); see Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers Meat Packers, Inc., 518 F.2d 1113, 1121 (3d Cir. 1975).

2. **Petitioners never objected to Arbitrator Plishtin's alleged misconduct, which is wholly unsupported by the arbitration record and did not prejudice Petitioners.**

Petitioners next attempt to discredit Arbitrator Cynthia Plishtin, accusing her of ex-parte communications with Mr. Lang, Respondents' representative at the arbitration. Incredibly, Petitioners lob these serious allegations *without a single citation* to the record or any other credible source.  See Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co. Ltd., 868 F.2d 52, 57 (3d Cir. 1989) (finding that ex-parte contact was insufficient grounds for vacatur where no prejudice was demonstrated, despite allegation that ex-parte information was used to render decision and assess the credibility of witnesses).  Put simply, there is absolutely no evidence to suggest that Ms. Plishtin engaged in any ex-parte communications with Mr. Lang.

Petitioners next contend that Ms. Plishtin exhibited "bias" during the arbitration. Yet again, Petitioners make serious allegations with scant citation to the record.  And where

Petitioners do cite to the record, it is manifestly clear that the record does not support any of their allegations.

For example, Petitioners point to Ms. Plishtin's statement to counsel during the first arbitration session as evidence of her "disdain" for Petitioners' counsel.  When placed in context, it is clear that Petitioners have thoroughly misconstrued Ms. Plishtin's comment.  Having heard both parties argue extensively on various discovery issues, the Panel deliberated and determined that it would not, at that point, order Respondents to produce any additional documentation.  (See 8/20/04 Tr. at 70-71.)  The Panel had made its decision known.  The parties then turned to another issue regarding the representation of the estate of Mr. Vizak in the proceedings.[8]

Once that issue was resolved, the Chair asked if there was "any other business" to be discussed.  The following exchange took place:

| | |
|---|---|
| MS. PLISHTIN: | The only other thing is that the panel has decided to hold in abeyance [sic] any sanctions – any ruling for any sanctions. |
| MR. GUILIANO: | Is the panel willing to reconsider to any extent Claimant's request for particular commission runs or exception reports? |
| MS. PLISHTIN: | You just heard our decision. |
| MR. GUILIANO: | Thank you. |
| MS. PLISHTIN: | Don't ask again. Okay? |
| MR. GUILIANO: | Thank you. |

---

[8]     Petitioners raised before the Panel their concern that the estate of Mr. Vizak was not represented at the arbitration.  The Panel considered Petitioners' objection and agreed to postpone the hearing until the Estate could be served and counsel retained.  That the Panel would agree to Petitioners' request to postpone the hearing surely undermines the argument that the Panel was prejudiced against Petitioners.

(8/20/04 Tr. at 85-86.)   There is nothing in this exchange that even remotely evidences bias.  It is merely an arbitrator making clear that the Panel had just ruled on the issue of discovery and Petitioners' counsel, apparently unhappy with that decision, should accept the Panel's ruling and not ask again about it.

Petitioners next suggest that Ms. Plishtin somehow interfered with the cross-examination of Mr. Lang.  Here, Petitioners state that "Ms. Plishtin's *sua sponte* rulings created larger issues potentially precluding the to [sic] the use and admissibility of other customer complaints and actions against Mr. Vizak" in connection with Petitioners' control and failure to supervise claims.  (Petitioners' Mem. at 30.)   Petitioners decline to identify the amorphous "larger issues" to which they refer.  They also fail to identify the "sua sponte" rulings to which they now object.  The single illustration to which Petitioners point is Ms. Plishtin's alleged insistence that a party move exhibits into evidence <u>before</u> questioning a witness about them.  (<u>Id.</u>)  This is hardly an unreasonable request or impediment to presenting evidence.  It surely does not constitute evidence of bias in favor of one party or another.  And there is no suggestion that Ms. Plishtin prevented Petitioners from presenting evidence.

Petitioners also allege that Ms. Plishtin sighed and groaned and displayed "contorted facial expressions" during the hearing.  Once again, there is nothing in the transcript that supports these allegations.

Finally, Petitioners seize upon Ms. Plishtin's statement to counsel – that she had "been an arbitrator for more than 20 years, probably longer than you've been a lawyer" – as evidence of bias.  (Petitioners' Mem. at 31.)  Here again, Petitioners miss the mark.  Even if out of context, there is nothing about this remark that demonstrates "arbitrator misconduct" or bias in favor of one party over the other.  However, when placed in context, there is little room for Petitioners' argument.

Petitioners' counsel introduced into evidence a document that contained personal information relating to another costumer whom Mr. Vizak had serviced while at Fahnestock. Ms. Plishtin informed counsel for all parties that she thought it was an inappropriate invasion of the customer's privacy and that counsel should take care to redact out such personal information in exhibits: "So I'm saying to both of you, we're saying to both of you that in the future, you know, if you want to show us something, we don't want to see who it is, because we feel that's an invasion of [the] customer's privacy." (3/8/05 Tr. at 260-61.)

Mr. Guiliano responded by lecturing Ms. Plishtin and the other arbitrators about their duties, stating in part: "[T]his is not a public forum whereas you file the document in Federal court, it's public record. As part of your oath as arbitrator, any information that you obtain at these proceedings you're required to keep confidential (inaudible.)" The exchange continued as follows:

| | |
|---|---|
| MS. PLISHTIN: | We know our duty very well. |
| MR. GUILIANO: | But this is not unusual in these kinds of cases where you get information about peoples' identities. |
| MS. PLISHTIN: | Well, I have been arbitrator for more than 20 years, probably longer than you've been a lawyer, and this is a real – because we don't feel that we should be exposed to this kind of information. So it's here now, but in the future, think twice before you do this. |

(3/8/05 Tr. at 261-62.)

Far from constituting bias, Ms. Plishtin's comments were occasioned by her fair-minded concern for the privacy of individuals who were not party to the arbitration. And Ms. Plishtin was fully justified in explaining her concern, particularly after Petitioners' counsel purported to lecture the Panel on their duties.

In sum, Petitioners do not even begin to provide evidence of the sort of arbitrator misconduct or actual bias that might warrant judicial review of the arbitration award. Petitioners' unfounded (and unsupported) complaints about Ms. Plishtin are palpably insufficient to justify vacatur. If Petitioners truly believed that Arbitrator Plishtin had "disdain" for Petitioners' counsel as alleged and that her conduct was as pervasive as Petitioners now claim, Petitioners had an obligation to object to the conduct *before* the award was rendered. Having failed to do so, these objections are also waived and cannot form the basis for vacatur. Dean Witter Reynolds Inc. v. Bork, 1991 WL 164465, at *3, No. 91-0392 (E.D. Pa. Aug. 21, 2001) (citing Graphic Arts Intern. Union, Local 97-B v. Haddon Craftsmen, Inc., 489 F. Supp. 1088, 1093 (M.D. Pa. 1979)); see Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers Meat Packers, Inc., 518 F.2d 1113, 1121 (3d Cir. 1975).

Even if not waived, vacatur based on bias or evident partiality requires the challenging party to provide evidence that is "powerfully suggestive of bias." Carmel v. Circuit City Stores, Inc., 2000 WL 1201891, at *3-4, No. 99-MC-240 (E.D. Pa. Aug. 22, 2000) (citing Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1523 n.30 (3d Cir. 1994)). Petitioners' unsupported and vague allegations do not evidence any prejudice to Petitioners and fall far short of evidence of the "powerful suggestion of bias" required to vacate the award.

### 3. Petitioners failed to object to Chairman Cahan's age and conduct and suffered no prejudice due to Chairman Cahan.

In what is perhaps the most appalling of their contentions, Petitioners assault Chairman Cahan, the Chairman of the Panel, as incompetent. Here again, the Petitioners decline to cite to the record for evidence of Chairman Cahan's alleged incompetence or indifference.[9]  It

---

[9]      The only "example" offered by the Petitioners is Chairman Cahan's inability to read the NASD Hearing Script, and an NASD staff attorney was forced to read it for him. (Petitioners' Mem. at 9.)  Once again, the Petitioners distort the record.  Chairman Cahan himself read the script.  (9/20/04 Tr. at 17-18, 19-20.)  Ms. Hoffman

is unclear how Petitioners' allegations regarding Chairman Cahan form the basis for their

vacatur petition.  Petitioners engaged in a selection process for arbitrators, and they did not

object to Chairman Cahan either prior to or during the arbitration.  They knew of his age and

qualifications prior to the arbitration, and they observed his actions during the arbitration.

Petitioners' counsel even told the Panel, which included Chairman Cahan, that it was "smart

enough to assign whatever weight it wants to these documents."  (8/22/05 Tr. at 325:12-15.)

   Indeed, if Petitioners or their counsel had any questions or concerns about

Chairman Cahan, they surely could have raised them before the hearing began.  But, as noted

above, Petitioners affirmed that they accepted the composition of the Panel, not once but twice.

Petitioners never raised any objection regarding Chairman Cahan or his abilities to serve as an

arbitrator at any point throughout the hearing.  Having accepted Chairman Cahan before, during,

and at the conclusion of the arbitration, Petitioners have no credible basis upon which to suggest

that he engaged in any misconduct sufficient to vacate the award.  Petitioners' new allegations to

the contrary amount to nothing more than character assassination arising from an adverse

arbitration award.

  **C.**  **The Award Is Supported by the Evidence and Was Neither In Manifest
Disregard of the Law Nor Irrational.**

   In their final attempt to have the award vacated, Petitioners contend that the

arbitrators manifestly disregarded the law and rendered an "irrational" award.  (Petitioners'

Mem. at 32-37.)  Yet again, apart from broad allegations, Petitioners fail to articulate how the

Panel disregarded the law.

---

merely offered to "state for the record what the NASD has on file" in terms of pleadings, an offer that Chairman
Cahan accepted.  (Id. at 18.)  Once Ms. Hoffman finished, Chairman Cahan resumed reading the NASD hearing
Script.  (Id. at 19-20.)

An award of an arbitrator is not subject to judicial revision unless it is "completely irrational."  A C and S, Inc. v. Travelers, 2004 WL 2075117, at *4 -5, No. 03-MC-0222  (E.D. Pa. Sept. 16, 2004).  In order to show a manifest disregard of the law, Petitioners must prove that (1) the law was well defined and explicit, (2) the law was clearly applicable and (3) the Panel simply chose to ignore the law.  Ruggiero v. A.R. Baron & Co., Inc., 1996 WL 179980, at *1, No. 95-0297 (E.D. Pa., Apr. 15, 1996). This standard requires more than just a misinterpretation of the law.  Id.; see also Local 863 Int'l Bd. of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 533 (3d Cir 1985), cert. denied, 475 U.S. 1085 (1986) (an erroneous interpretation of the law is insufficient to meet the manifest disregard of the law standard).

Moreover, "[i]t is not proper for the Court to 'sit as the panel did and re-examine the evidence.'  Errors in the arbitrators' factual findings or interpretations of the law do not justify a court's review or reversal on the merits."  Grosso v. Salomon Smith Barney, 2003 WL 22657305, at *2, No. 03-MC-115 (E.D. Pa. Oct. 24, 2003) (quoting Mutual Fire, Marine & Inland v. Norad Reinsurance, 868 F. 2d 52 (3d Cir. 1989).  A court may not overrule an arbitrator simply because it disagrees with the arbitrator's interpretation of the law.  Id.  Even where the court is convinced that the arbitrator has committed serious error, the award must be enforced unless there is absolutely no support at all in the record justifying the arbitrator's determinations.  Id.  Manifest disregard of the law encompasses situations in which it is evident from the record that the arbitrator recognized the applicable law and just chose to ignore it.  Id.  The Court cannot reassess the evidence or make judgments about witness credibility.  Id. at *4.  Where an arbitrator has not set forth the specific rationale supporting the decision, the Court must confirm an award if a ground for the arbitrator's decision can be inferred from the facts of the case.  Id. at * 5.

25

Even a cursory review of the record demonstrates that there was more than sufficient basis for the Panel's denial of Petitioners' claims.

First, the Petitioners failed to provide evidence that any of the securities that they purchased were unsuitable. Petitioners presented no expert testimony at all on the issues of suitability, churning, or any of the other claims asserted. Petitioners' sole expert witness was an accountant who merely testified regarding the damages that the Petitioners sustained in their Fahnestock accounts. (3/9/05 Tr. at 401-407.) He did not testify at all regarding the activity in Petitioners' accounts or the suitability of Petitioners' investments at Fahnestock. In fact, at no point throughout the hearing did the Petitioners even indicated which transactions they contended were unsuitable.

The principal witness in support of the Petitioners' claims was Jack Lebeau, who testified for over three days. Given that Petitioners' claims were based almost entirely on his testimony, Dr. Lebeau's credibility was plainly central to the Panel's decision. It was through Dr. Lebeau that Petitioners' purported to present evidence regarding, among other things, the suitability (or lack thereof) of their investments at Fahnestock, the "fraudulent" statements that Mr. Vizak allegedly made to Petitioners, their alleged lack of knowledge with regard to investments, Mr. Vizak's alleged unauthorized purchase or sale of investments, and the like.

However, after attempting to present the factual evidence in support of their claims through Dr. Lebeau, Petitioners' counsel affirmatively declared Dr. Lebeau – his own witness – **incompetent to testify** on the final day of the arbitration. (See 8/23/05 Tr. at 32-37.) By declaring Dr. Lebeau incompetent, the Petitioners completely undermined the credibility of their central witness, and severely compromised the value of his testimony. Having failed to present any expert testimony on issues central to their claims, and then having effectively

26

informed the Panel that their key fact witness was incompetent and his testimony not credible, the Petitioners should hardly be surprised that the Panel found that they failed to prove their case.

Second, the evidence presented to the Panel was more than sufficient to support its finding of no liability.  Respondents argued throughout the arbitration that Petitioners' investments at Fahnestock were entirely suitable for them, and that the Petitioners knowingly accepted the risks associated with their investment strategy at Fahnestock because (i) they chose to withdraw huge sums of money from their investment accounts and (ii) they knew that the only way they could even attempt to sustain their spending was to seek substantial returns from their investment assets.  Put differently, the Petitioners' were knowledgeable investors who, despite being fully aware of alternative (and more conservative) investments and investment advisors, chose to pursue an aggressive growth strategy with Mr. Vizak in order to support their spending habits.

The evidence that the Panel heard in support of Respondents' argument included the following:

- Contrary to Petitioners' attempt to portray Dr. Lebeau as severely disabled as a result of an automobile accident in 1995, he was sufficiently possessed of his mental faculties that he subsequently taught college courses, served on various boards, and beginning in 2000 served as medical consultant to Rentar Environmental Solutions, a Florida company in which Dr. Lebeau sought to invest.  (See 3/9/05 Tr. at 475-78, 480-88, 491-92, 492-498.)

- In 1997, the Lebeaus split roughly $3,000,000 in assets between their investment accounts at Morgan Stanley and their accounts Fahnestock.  According to Dr. Lebeau, he did this so as to not put "all of his eggs in one basket." (3/9/05 at Tr. at 521.)  Plainly, Dr. Lebeau understood early on the importance of diversification and, more importantly, he understood that he had alternatives to investing with Fahnestock or Mr. Vizak.

27

- Dr. Lebeau also understood that he had alternatives when it came to the types of investments available to him.  At Morgan Stanley, he invested almost exclusively in fixed income investments, primarily municipal bonds.  Dr. Lebeau acknowledged that he knew fixed income investments like bonds and CDs were "safe and secure."  (3/9/05 Tr. at 525.)   He also knew that more conservative, or safer, investments (such as bonds and CDs) provided lower returns, and investments that provided higher returns typically involved greater risk. (3/9/05 Tr. at 639-640.)

- At the same time they purchased and maintained fixed income investments at Morgan Stanley, the Lebeaus decided to invest in equities at Fahnestock.  Between 1997 and 1999, the Lebeaus chose to "diversify" their holdings in this manner.  (3/10/05 Tr. at 64.)

- When the Lebeaus deposited $1,500,000 into their Fahnestock accounts in 1997, Mr. Vizak recommended that 50% of the funds be managed by an outside money manager named Roher Asset Management, and 50% remain in a non-discretionary account at Fahnestock with Mr. Vizak as the financial consultant.  The Lebeaus agreed, and followed Mr. Vizak's recommendation. (3/9/05 Tr. at 570-602.)

- However, within two months, the Lebeaus chose to (i) terminate Roher Asset Management and (ii) have all of their Fahnestock assets managed by Arthur Karafin, a financial advisor of their own choosing.  (Id.)  For the next two years, the Lebeaus had Mr. Karafin managing their assets at Fahnestock.[10]

- From the time they split their investment asserts between Morgan Stanley and Fahnestock, the Lebeaus regularly withdrew (and spent) incredibly large sums of money

---

[10]    This evidence put the lie to Petitioners' contention that they blindly followed whatever Mr. Vizak recommended and did not make their own decisions.  Plainly, the Lebeaus were fully capable and comfortable rejecting Vizak's investment advice.

from their investment assets.  Initially, the Lebeaus used their Morgan Stanley account for withdrawals.  Between 1997 and January 1999, the Lebeaus withdrew approximately $800,000 from their Morgan Stanley account.  (See 3/9/05 Tr. at 611-627.)

- The Lebeaus were also acutely aware that their withdrawals were far in excess of the income generated by their fixed income investments.  (Id.)  The Lebeaus knew that they were depleting their principal at Morgan Stanley as a result of their spending.  (Id.)  The Lebeaus also knew that given their spending habits, they would deplete their assets entirely in a relatively short period of time if they remained invested in fixed income instruments.  (3/10/05 Tr. at 32-33.)

- With this knowledge, the Lebeaus chose to transfer their holdings from Morgan Stanley and consolidate their assets at Fahnestock in early 1999.  At the same time, the Lebeaus' fired Karafin and chose to have Mr. Vizak alone be their financial consultant. (3/10/05 Tr. at 34, 39-40.)  In short, they chose to have Mr. Vizak as their sole financial consultant, and they knew that their investment strategy with Mr. Vizak would be different from both the conservative strategy at Morgan Stanley and Mr. Karafin's strategy.  (3/9/05 Tr. at 629-632.)  The value of the Lebeaus' joint account after they transferred in their Morgan Stanley holdings was roughly $2,625,000.  (3/10/05 Tr. at 42-43.)

- Having seen from their time at Morgan Stanley that relatively safe investments did not provide returns sufficient to meet their spending habits, the Lebeaus knew that they could only hope to support their chosen lifestyle by investing primarily in equities, and the evidence indicates that they accepted the greater risks that accompanied equity investing. Dr. Lebeau acknowledged that he wanted to make more money from his investments at Fahnestock because he and his wife were spending more money.  (3/9/05 Tr. at 630-32.)

29

- As they had at Morgan Stanley, the Lebeaus continued to withdraw and spend substantial sums of money from their Fahnestock accounts.  (3/10/05 Tr. at 40.)  For example, in 1999, the Lebeaus withdrew $403,000 from their Fahnestock account.  (3/10/05 Tr. at 58.)

-  The Lebeaus also signed a margin agreement when they consolidated their assets at Fahnestock in 1999, and they discussed margin with Mr. Vizak at the time they signed it. (3/10/05 at 46-47.)  The Lebeaus also kept a margin balance throughout most of their time at Fahnestock.  (8/22/03 Tr. at 213-14.)  As Dr. Lebeau testified, he was aware that the margin balance they carried in their joint account was the result of the substantial checks the Lebeaus wrote against their account.  (3/10/05 Tr. at 48, 149-55, 216-228.)

- The Lebeaus' accounts at Fahnestock performed very well in 1999 and into 2000.  In 1999, for example, the Lebeaus' accounts increased almost $900,000 in value.  (3/10/05 Tr. at 15, 58-59).

- The evidence was clear that the Lebeaus were fully informed and aware of their transactions and all other aspects of their accounts at Fahnestock.  Dr. Lebeau acknowledged that he received written confirmations of every purchase or sale of a security within days of the transaction.   He acknowledged that he received and reviewed monthly account statements, which showed, among other things, the account value, the individual holdings and gains and losses on those holdings, the Lebeaus' margin debit, and the amount they were charged in margin interest.  (See 3/9/05 Tr. at 380; 3/10/05 Tr. at 9-10, 12-13, 61-62;  8/22/05 Tr. at 52.)

-  Dr. Lebeau also testified that he had on-line access to his Fahnestock accounts and that he revised his accounts on-line four or five times per week.  (3/10/05 Tr. at 87, 94.)  The

Lebeaus also subscribed to and read the Wall Street Journal, the New York Times, and the Philadelphia Inquirer.  (3/10/05 Tr. at 89-90.)

- Dr. Lebeau spoke with Mr. Vizak regularly, and visited him at Fahnestock's Jenkintown, PA office regularly to discuss his investments.  (3/10/05 Tr. at 16-17.)  Dr. Lebeau also spoke with Alan Lang, Mr. Vizak's manager, on a regular basis.  (3/8/05 Tr. at 193-96.)

- Dr. Lebeau understood that his investment could fluctuate significantly in value.  (3/10/05 Tr. at 60-61.)  Indeed, Dr. Lebeau saw his accounts decline significantly in value in early 2000, when the joint account lost $700,000 in value in just two months, between March and May 2000.  (3/10/05 Tr. at 68-70.)  After rebounding during the summer, the accounts again lost substantial value beginning in September 2000.  (3/10/05 Tr. at 159-166.)

- Despite these significant paper losses, the Lebeaus continued to have a net profit in their Fahnestock accounts throughout 2000 and into 2001.  (8/22/05 Tr. at 85.)  Indeed, at any point prior to July 2001 the Lebeaus could have pursued a more conservative investment strategy without having lost any principal whatsoever, had they chosen to do so. (See id.)

- The Lebeaus knew they could change advisors and leave Fahnestock at any time.  (3/10/05 Tr. at 83-84; 8/22/05 Tr. at 63-64.)  Even after seeing the significant fluctuation in the value of their investments and accounts throughout 2000, the Lebeaus "could have done something else but we stayed the course."[11]  (3/10/05 Tr. at 170-71.)  Dr. Lebeau conceded that they stayed the course knowing that their investments could continue to decline in value.  (8/22/05 Tr. at 92-93.)

---

[11]     In fact, Dr. Lebeau did transfer his IRA account to another firm in July 2001, but chose to leave his joint account at Fahnestock with Mr. Vizak as Financial Consultant, thereby demonstrating both his control over his accounts and his ability to change investment strategy when he wanted.  (8/22/05 Tr. at 66-67.)

- Despite knowing that their investments were losing substantial value, the Lebeaus made no effort to reduce their withdrawals from the account. (8/22/05 Tr. at 53-54.) To the contrary, the Lebeaus withdrew $491,000 from their account in 2000. (3/10/05 Tr. at 58.) The Lebeaus continued their withdrawals knowing full well it could eat into their principal. (3/10/05 Tr. at 158-59).

- In July 2001, Alan Lang had a meeting with the Lebeaus and he informed them that they could not continue to withdraw money from the account as they had and "still maintain a semblance of a portfolio." (3/8/05 Tr. at 193-196.) Dr. Lebeau conceded that despite Mr. Lang's caution, he and his wife did not decrease their spending. (8/22/05 Tr. at 175-77.)

- In fact, the Lebeaus <u>never</u> decreased their spending or their withdrawals from their Fahnestock accounts, even though they knew their investments were declining in value. (3/10/08 Tr. at 158.) Dr. Lebeau conceded that while he and his wife discussed curbing their spending, they never did reduce the amounts they withdrew from their accounts. (3/10/05 Tr. at 156-58.) In a poignant admission, Dr. Lebeau stated that they spent money well beyond "the time it was appropriate to do that." (3/10/05 Tr. at 158.)[12]

- Even after Dr. Lebeau transferred his IRA account to another firm in July 2001, he pursued a very aggressive investment strategy, including short-term trading, options trading, trading in penny stocks, and purchasing very large positions in technology and other aggressive growth stocks. (<u>See</u> <u>generally</u> 8/22/05 Tr. at 94-125, 135-166.)

- Even after the Lebeaus transferred their joint account away from Fahnestock in mid-2002 and after they commenced the arbitration, they continued to withdraw money from their

---

[12]     There is no doubt that the Lebeaus' simply spent the money they withdrew from their accounts. In the words of Mrs. Lebeau, "I spent the money, That part I did." (3/10/05 Tr. at 190-91, 192-95, 207.)

new account and to hold securities on margin in that account.  (8/22/05 Tr. at 262-273.)

Eventually, the Lebeaus spent all of their money.  (8/22/05 Tr. at 273.)

The foregoing evidence is just a sampling of the evidence that Respondents presented to the Panel in support of its contention that the Petitioners alone were responsible for their investment decisions and, as such, they were not entitled to recover anything from Respondents.  This was precisely what Respondents' counsel argued to the Panel in closing arguments.  (See 8/23/05 Tr. at 97-143.)  The Panel apparently accepted Respondents' arguments and determined that the evidence simply did not warrant an award in Petitioners' favor.

Given the evidence presented, there is simply no basis upon which one could conclude that the Panel's decision was either irrational or in manifest disregard of the law.  Petitioners assert no basis for their claim that the Panel manifestly disregarded the law or made an irrational decision, other than Petitioners' own disagreement with the award.  Petitioners do not claim that a specific law was not applied but rather that the Panel "knew what the law was" and found against Petitioners.  This is insufficient grounds for vacatur.

## IV.   CONCLUSION

WHEREFORE, Respondents Oppenheimer & Co. Inc. and the Estate of Jeffrey S. Vizak hereby request that the Court deny the Petition to Vacate of Petitioners Jack and Sharon Lebeau and grant the Cross-Petition to Confirm the Arbitration Award.

WM743 / ANH5734
William E. Mahoney, Jr., Esq.
A. Nicole Stover, Esq.
Stradley, Ronon, Stevens & Young, LLP
One Commerce Square
Philadelphia, PA  19103
(215) 564-8000

Attorneys for Respondents,
Oppenheimer & Co. Inc. and
the Estate of Jeffrey S. Vizak

Dated: January 4, 2006

33

420396